AUSA: Justin Horton

| UNITED STATES DISTRICT COURT  SOUTHERN DISTRICT OF NEW YORK | **24 MAG 3108** |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AUBREY ALEXANDER, and<br>CARLA COBB,<br><br>                         Defendants. | **SEALED COMPLAINT**<br><br>Violations of<br>18 U.S.C. §§ 1343, 1349, and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

ZACHARY D. WILLIAMS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

1.  From at least in or about May 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, AUBREY ALEXANDER and CARLA COBB, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.  It was a part and an object of the conspiracy that AUBREY ALEXANDER and CARLA COBB, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, ALEXANDER and COBB agreed to make and caused to be made false statements to Victim-1 and Victim-2 in order to obtain money for purported investments that did not exist, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

3.  From at least in or about May 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, AUBREY ALEXANDER and CARLA COBB, the defendants, and others known and unknown, knowingly having devised and intending to devise a

scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ALEXANDER and COBB agreed to make and caused to be made false statements to Victim-1 and Victim-2 in order to obtain money for purported investments that did not exist, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

<u>COBB Introduces Victim-1 to ALEXANDER</u>

4.      Based on my involvement in this investigation, my review of documents, and my conversations with witnesses and other law enforcement agents, I have learned the following, in substance and in part:

   a.   Victim-1 was a Manhattan-based businessperson and the former owner of a New York City-based real estate firm.

   b.   In or about 2018, a mutual acquaintance introduced Victim-1 to CARLA COBB, the defendant. Victim-1 and COBB spoke with each other by FaceTime on several occasions after their introduction. During these discussions, COBB told Victim-1 that she was an "intake officer" at a London-based bank with "trade desks." COBB also told Victim-1 that she had previously performed law enforcement work for the Federal Reserve.

   c.   In or about 2019, COBB introduced Victim-1 to AUBREY ALEXANDER, the defendant. COBB told Victim-1, in substance and in part, that COBB worked for ALEXANDER and that ALEXANDER had investment opportunities in which Victim-1 could participate.

<u>ALEXANDER and COBB Propose Investment Opportunity-1</u>

   d.   In or about May 2019, COBB and ALEXANDER represented to Victim-1, in substance and in part, that they had an available investment opportunity that involved "monetizing a financial instrument" ("Investment Opportunity-1"). As described to Victim-1 by COBB and ALEXANDER, Victim-1 would send $300,000 to ALEXANDER. In turn, ALEXANDER would invest Victim-1's money in a purported financial instrument that would generate tens of millions of dollars of profits within sixty business days.

   e.   Victim-1 asked a business contact—a Louisiana-based medical doctor ("Victim-2," and together with Victim-1, the "Victims")—to invest alongside her in Investment Opportunity-1. Victim-1 conveyed to Victim-2 the description of Investment Opportunity-1 provided by COBB and ALEXANDER, and Victim-2 agreed to invest alongside Victim-1.

    f. On or about May 31, 2019, COBB sent Victim-1 and Victim-2 a digital document labeled a "Profit Participation Agreement" (the "Bank Instrument PPA"). The Bank Instrument PPA purported to provide, in substance and in part, that:

      i. Investment Opportunity-1 was "the monetization of a bank instrument from one of the top ten banks," and "the opportunity to participate in the trade profits derived from the monetization of the instrument."

      ii. COBB and Victim-1 were "Clients," and Victim-2 was an "Associate," an arrangement that COBB told Victim-1, in sum and in substance, had to be done.

      iii. That Victim-2 would wire $300,000 to Victim-1, and that Victim-1 would then "immediately" wire the same funds to "a registered licensed broker dealer located in New York"—an apparent reference to ALEXANDER—"to commence" "the monetization of the instrument."

      iv. That profits from Investment Opportunity-1 "shall be Forty-Five to Sixty Million ($45,000,000.00 to 60,000,000.00) US Dollars," and that Victim-2 would receive 10% of these profits while COBB and Victim-1 would receive and share 75% of these profits.

    g. On or about June 3, 2019, Victim-2 wired $300,000 for Investment Opportunity-1 to Victim-1 from a bank account in Louisiana to a bank account in New York.

    h. On or about June 8 and June 9, 2019, COBB, Victim-1, and Victim-2 used an online signature-processing service to sign the Bank Instrument PPA.

    i. On or about June 8, 2019, ALEXANDER, COBB, and Victim-1 used the online signature-processing service to sign a document labeled a "Trade Agreement" (the "Bank Instrument Trade Agreement") and bearing the letterhead of ALEXANDER's purported eponymous New York limited liability company ("ALEXANDER LLC-1").

    j. The Bank Instrument Trade Agreement purported to provide, in substance and in part, that:

      i. COBB and Victim-1 (through Victim-1's limited liability company ("Victim LLC-1")) were co-investors, an arrangement that COBB told Victim-1, in sum and in substance, had to be done.

      ii. ALEXANDER LLC-1 would "utilize the cash" provided by Victim-1 for a "Private Investment Opportunity."

      iii. After COBB and Victim-1 sent $300,000 to ALEXANDER LLC-1's bank account, ALEXANDER LLC-1 would "acquire a banking instrument" and cause its "monetization."

      iv. Within 65 banking days after receiving Victim-1's cash, ALEXANDER LLC-1 would either pay COBB and Victim-1 either "one lump sum payment" of $45,000,000, or "return the full $300,000."

k. On or about June 10, 2019, based on ALEXANDER's and COBB's representations made in the Trade Agreement, the Bank Instrument PPA, and Victim-1's conversations with COBB, Victim-1 wired $300,000 from her personal bank account in Manhattan to a bank account in Manhattan under the name of ALEXANDER LLC-1 for which ALEXANDER was the sole authorized signor ("ALEXANDER Bank Account-1").

ALEXANDER and COBB Propose Investment Opportunity-2

l. In or about August 2019, ALEXANDER and COBB described a second investment opportunity that Victim-1 and Victim-2 could join while Victim-1 and Victim-2 waited for their returns on Investment Opportunity-1: a purchase and sale of valuable diamonds ("Investment Opportunity-2").

m. On or about August 26, 2019, COBB provided Victim-1 electronically with a second "Profit Participation Agreement" (the "Diamonds PPA"). Like the Bank Instrument PPA, the Diamonds PPA called for Victim-2 to wire $300,000 to Victim-1, who would then invest that money alongside COBB by sending the funds to "a registered licensed broker dealer located in New York"—an apparent reference to ALEXANDER. In turn, ALEXANDER would "facilitate the purchase of diamonds for monetization," and either pay $60,000,000 to COBB and Victim-1 within 50 days or refund their investment.

n. On or about August 26, 2019, COBB, Victim-1, and Victim-2 used an online signature-processing service to sign the Diamonds PPA.

o. On or about August 26, 2019, ALEXANDER, COBB, and Victim-1 (on behalf of Victim-1 LLC) signed a second "trade agreement" (the "Diamonds Trade Agreement").

p. Like the Bank Instrument Trade Agreement, the Diamonds Trade Agreement called for COBB and Victim-1 to wire $300,000 to ALEXANDER LLC-1's bank account, after which ALEXANDER LLC-1 would "acquire precious gem stones including diamonds" and either pay COBB and Victim-1 $45,000,000 in profits within 45 banking days or refund the $300,000 investment.

q. On or about August 26, 2019, Victim-2 wired $300,000 to Victim-1, and Victim-1 in turn wired $300,000 to ALEXANDER Bank Account-1. On or about August 27, 2019, ALEXANDER texted Victim-1 to confirm that ALEXANDER had received this second $300,000 wire.

4

### ALEXANDER and COBB's Receipt and Spending of the Victims' Money

5. Based on my review of bank records and my communications with other law enforcement agents, I have learned the following, in substance and in part:

   a. AUBREY ALEXANDER, the defendant, spent nearly all of the $600,000 received from Victim-1 within two months of receiving each of Victim-1's two wires. ALEXANDER's expenditures of the Victims' investment funds included, among other things, two payments of $10,000 each to CARLA COBB, the defendant: one on or about June 11, 2019 (that is, the day after Victim-1 wired $300,000 to ALEXANDER) and the other on or about August 27, 2019 (that is, the day after Victim-1 wired a second payment of $300,000 to ALEXANDER).

   b. Between on or about June 10, 2019, and on or about August 21, 2019, ALEXANDER spent all but approximately $500 of the $300,000 that Victim-1 had wired to ALEXANDER on or about June 10, 2019 for Investment Opportunity-1. Notwithstanding ALEXANDER's and COBB's representations to Victim-1 and Victim-2 that their $300,000 wire from June 10, 2019 would be invested in a "bank instrument," ALEXANDER subsequently wired Victim-1's funds to, among other recipients, entities with no apparent connection to either purported investment and a personal account in ALEXANDER's name.

   c. Between on or about August 26, 2019, and on or about October 15, 2019, ALEXANDER spent the entirety of the $300,000 that Victim-1 had wired to him on or about August 26, 2019 for Investment Opportunity-2. ALEXANDER's expenditures during this period included transferring approximately $71,000 to a personal bank account in ALEXANDER's name, approximately $14,500 in retail purchases, and $2,000 to a bank account in ALEXANDER's wife's name.

### ALEXANDER and COBB's Communications to Extend the Scheme

6. Based on my involvement in this investigation, my review of documents, conversations with witnesses, and other law enforcement agents, I have learned the following, in substance and in part:

   a. Between in or about August 2019 and in or about June 2022, AUBREY ALEXANDER and CARLA COBB, the defendants, continued to communicate with Victim-1 and Victim-2 to, among other things, provide additional explanations for the purported delay in paying out profits or refunds.

   b. On or about September 13, 2019, for example, ALEXANDER sent Victim-1 a text message saying, in substance and in part, "The funds will not hit my account today." On or about October 7, 2019, after Victim-1 made repeated efforts to contact ALEXANDER, ALEXANDER sent Victim-1 a text message saying, in substance and in part, "I'm not ignoring you, I'm just swamped."

      c. On or about November 26, 2019, COBB—with reference to Investment Opportunity-1—texted Victim-1, in substance and in part, that "[t]he trade platform we signed up for didn't work," and that ALEXANDER's purported plan was to "[r]eturn those funds" from Investment Opportunity-1 "and finish out the diamond trade"—that is, provide Victim-1 and Victim-2 a refund for Investment Opportunity-1 while working to obtain profits from Investment Opportunity-2.

      d. Between on or about January 8, 2020 and on or about January 9, 2020, ALEXANDER, COBB, and Victim-1 executed a purported "amendment" to the Bank Instrument Trade Agreement (the "Amended Trade Agreement"). In substance and in part, the Amended Trade Agreement purported to acknowledge that ALEXANDER had failed to pay out profits from Investment Opportunity-1 and that COBB, "a sole independent party," had "agreed to advance" $6,400,000 to Victim-2 on behalf of ALEXANDER. In return, COBB would receive the first $6,400,000 in eventual but delayed profits from Investment Opportunity-1.

      e. Approximately one week later, on or about January 15, 2020, Victim-1 tried unsuccessfully to contact ALEXANDER after Victim-1 had not received any payments from either ALEXANDER or COBB. ALEXANDER texted Victim-1, in substance and in part, that ALEXANDER was finishing up another transaction and could not speak, but that ALEXANDER had provided Victim-2 with an update.

      f. In or about September 2020, Victim-1 and Victim-2 arranged to meet ALEXANDER and COBB in New York City to hear an update about their purported investments. COBB backed out of the meeting, but ALEXANDER met with Victim-1 and Victim-2 at a restaurant in Manhattan.

      g. At this September 2020 meeting, ALEXANDER made additional representations to the effect that profits from Investment Opportunity-1 and Investment Opportunity-2 were delayed but forthcoming. At the same meeting, ALEXANDER told Victim-1 and Victim-2, in sum and in substance, that COBB had not invested any of COBB's own money alongside Victim-1 and Victim-2, but that ALEXANDER had paid COBB $20,000 for referring Victim-1 and Victim-2 to ALEXANDER. COBB had previously represented to Victim-1 that COBB had, in fact, invested COBB's own money alongside Victim-1.

      h. In or about August 2021 and November 2021, in response to Victim-1's efforts to communicate, ALEXANDER sent Victim-1 text messages claiming, in substance and in part, that ALEXANDER was suffering from health problems that were causing him to be unable to communicate regularly with Victim-1.

      i. In or about June 2022, ALEXANDER sent a text message to Victim-2 stating, in sum and in substance, that "funds will most definitely be returned."

      j. Neither ALEXANDER nor COBB ever returned any money to Victim-1 or Victim-2.

WHEREFORE, I respectfully request that warrants be issued for the arrest of AUBREY ALEXANDER and CARLA COBB, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

/s/ Zachary D. Williams, by SDA with permission

_____
Zachary D. Williams
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 26th day of August, 2024.

_____
THE HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York